## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **TO BE FILED UNDER SEAL** |
| | : |
| v. | : Hon. André M. Espinosa |
| | : |
| JAMES D. FEELEY | : Mag. No. 22-11377 |
| | : |
| | : **CRIMINAL COMPLAINT** |
| | : |

I, Meghan Marino, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Department of Defense—Office of Inspector General, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Meghan Marino, Special Agent
Dept. of Defense—Office of Inspector General

Special Agent Marino attested to this Affidavit
by telephone pursuant to F.R.C.P. 4.1(b)(2)(A).

December 2, 2022, at
District of New Jersey

HONORABLE ANDRÉ M. ESPINOSA        _____
UNITED STATES MAGISTRATE JUDGE        Signature of Judicial Officer

## ATTACHMENT A

## COUNT ONE
### (Conspiracy to Violate the Federal Anti-Kickback Statute)

From in or about January 2016 through in or about September 2020, in the District of New Jersey, and elsewhere, defendant

## JAMES D. FEELEY

knowingly and intentionally conspired and agreed with others to commit certain offenses against the United States, namely:

(a) to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service, namely, the referral of prescriptions, for which payment may be made in whole or in part under a Federal health care program, namely, Medicare and TRICARE, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A); and

(b) to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service, namely, to doctors for signed prescriptions, for which payment may be made in whole or in part by a Federal health care program, namely Medicare and TRICARE, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A).

In violation of Title 18, United States Code, Section 371.

## COUNT TWO
### (Conspiracy to Commit Health Care Fraud)

From at least January 2016 through in or around September 2020, in the District of New Jersey, and elsewhere, defendant

## JAMES D. FEELEY

knowingly and willfully conspired and agreed with others to execute a scheme and artifice to defraud health care benefit programs, including Medicare and TRICARE, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, health care benefit programs, including Medicare and TRICARE, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

In violation of Title 18, United States Code, Section 1349.

## ATTACHMENT B

I, Meghan Marino, a Special Agent with the Department of Defense—Office of Inspector General ("DoD-OIG"), having conducted an investigation and having discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause. Unless specifically indicated, all dates described in this affidavit are approximate and all conversations and statements described in this affidavit are related in substance and in part.

### Relevant Individuals and Entities

1.      At various times relevant to this Criminal Complaint:

a.      Defendant James D. Feeley ("FEELEY") lived in Elyria, Ohio and Navarre, Florida.

b.      Mark Belter ("Belter"), a co-conspirator not charged in this Complaint, lived in North Ridgeville, Ohio.

c.      David C. Laughlin, Jr. ("Laughlin"), a co-conspirator not charged in this Complaint, lived in Buckeye, Arizona.

d.      Defendant Stephen Luke ("Luke"), a co-conspirator not charged in this Complaint, lived in Phoenix, Arizona.[1]

e.      Ethan Welwart ("Ethan Welwart"), a co-conspirator not charged in this Complaint, lived in North Brunswick, New Jersey.

f.      William Welwart ("William Welwart"), a co-conspirator not charged in this Complaint, lived in Staten Island, New York.

g.      Elan Yaish ("Yaish"), a co-conspirator not charged in this Complaint, lived in Cedarhurst, New York.[2]

---

[1] Belter, Laughlin, and Luke were charged by criminal complaint with conspiracy to violate the Anti-Kickback Statute on September 8, 2020 in the District of New Jersey in *United States v. Mark Belter, et al.*, Mag. No. 20-13401 (LDW).

[2] Ethan Welwart, William Welwart, and Elan Yaish were charged by criminal complaint with conspiracy to violate the Anti-Kickback Statute on September 2, 2020 in the District of New Jersey in *United States v. Ethan Welwart, et al.*, Mag. No. 20-12359 (JBC).

4

h.       Health Pain Solutions, LLC ("HPS") and Midwest Pharmacy Consulting, LLC ("MPC") were companies located in North Ridgeville, Ohio. Midwest Medical Network LLC ("MMN") was a company located in Avon, Ohio. HPS, MPC, and MMN were purported marketing companies doing business throughout the United States and were owned and operated by FEELEY and Belter as 50/50 partners.

i.       RediDoc LLC ("RediDoc") was incorporated in Arizona and had its principal place of business in Phoenix, Arizona.  RediDoc was a purported telemedicine company doing business throughout the United States and was owned and operated by Laughlin and Luke.

j.       Apogee Bio-Pharm LLC ("Apogee") was a pharmacy located in Edison, New Jersey, doing business throughout the United States, and was owned by Ethan Welwart, and operated by Ethan Welwart, William Welwart, and Yaish.

### Medicare and TRICARE

k.       Medicare was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.

l.       Medicare was divided into four parts: hospital insurance (Part A); medical insurance (Part B); Medicare Advantage (Part C); and prescription drug benefits (Part D). This coverage is managed by pharmacy benefit managers and other private companies approved by Medicare.

m.       TRICARE was a health care benefit program for the Military Health System that provided health insurance coverage for Department of Defense ("DoD") beneficiaries worldwide, including active duty military service members, National Guard and Reserve members, retirees, their families, and survivors.  The Defense Health Agency, an agency of the DoD, oversaw and administered TRICARE.

n.       Both Medicare and TRICARE (and their pharmacy benefits manager) were "health care benefit programs" that affected commerce as defined in 18 U.S.C. § 24(b) and "federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f). "Beneficiaries" were individuals covered by these programs.

### Telemedicine

o.       Telemedicine provided a means of connecting patients to physicians by using telecommunications technology, such as video or telephone.

p.       Telemedicine companies hired physicians and other health care providers to furnish telemedicine services to individuals. Telemedicine companies

typically paid health care providers a fee to conduct consultations with patients. To generate revenue, telemedicine companies typically billed Medicare or other health insurance programs, or charged a consultation fee.

## The Illegal Kickback and Referral Conspiracy

2.      From at least January 2016 through in or about September 2020, FEELEY, Belter, HPS, and others worked together with pharmacies, telemedicine companies, and doctors to unlawfully profit by paying kickbacks and bribes to telemedicine companies to generate prescriptions for their pharmacy clients to fill. The telemedicine companies, in turn, paid kickbacks and bribes to doctors so that they would sign high volumes of expensive prescriptions.  The pharmacies then paid kickbacks and bribes to HPS for each prescription referral received from HPS.  The kickback payments paid to HPS were a percentage of the reimbursements the pharmacies received from Federal health care programs for filling the prescriptions generated by HPS.

3.      FEELEY and Belter operated HPS as a purported marketing company for pharmacies, which generated signed prescriptions that its pharmacy customers could fill and for which they could seek reimbursement.

4.      Through interviews with multiple witnesses, law enforcement learned that FEELEY made arrangements with telemedicine companies to procure signed prescriptions for HPS's pharmacy clients. Belter then prepared and executed the agreements with the telemedicine companies on behalf of HPS.

5.      FEELEY and Belter, acting through HPS, along with other marketers identified Beneficiaries to target for expensive medications.  The medications typically included pain creams, scar creams, eczema creams, and migraine medication.

6.      After identifying a Beneficiary, HPS cold-called them to persuade the Beneficiary to agree to try the medications—even when the Beneficiary's need for those items was not clear and was not discussed with the doctor's who actually had a relationship with the Beneficiary. HPS then transmitted to telemedicine companies, including RediDoc, the Beneficiaries' medical information and recorded phone calls, along with proposed prescriptions (the "Beneficiary Information Package"). Records obtained in the investigation included the proposed prescriptions that had pre-marked check-off boxes for particular drugs that would yield large reimbursements.

7.      Records, including financial records, obtained during the investigation showed that FEELEY and Belter then paid, through HPS bank accounts, kickbacks to the telemedicine companies for each signed prescription they collected. The telemedicine companies, including RediDoc, in turn paid kickbacks to doctors for each prescription they signed. The telemedicine companies, including RediDoc, then

6

transmitted the prescriptions to pharmacies selected by HPS, FEELEY, and Belter, which submitted claims for reimbursement to Federal health care programs. The pharmacies, including Apogee, paid HPS, FEELEY, and Belter kickbacks for originating the Beneficiaries' claims.

8.     FEELEY arranged to purchase Beneficiary information (also referred to as "leads"), which usually included Beneficiaries' personal and health insurance information, from various sources, including overseas call centers and data brokers. Documents obtained during the investigation show FEELEY, Belter, and HPS used this information to identify their targets for cold calling. FEELEY, Belter, and HPS targeted Beneficiaries because they had insurance that would reimburse for expensive drugs regardless of whether the Beneficiaries had medical need for those products.

9.     The investigation has revealed that FEELEY, Belter, and HPS employed "sales representatives," frequently high school students with no medical licenses or training, to call the Beneficiaries. HPS often deceived Beneficiaries into accepting medications by providing false and misleading information to the Beneficiaries about the nature, cost, and efficacy of the medications they would receive. At the end of sales call, the sales representative would run through a list of summary questions designed to secure the Beneficiaries' confirmation and make it appear that the Beneficiaries had requested the drugs that the marketers and pharmacies were attempting to sell. This part of the phone call was recorded and referred to as the "compliance recording." The compliance recording was provided to the telemedicine company. The beginning part of the sales call, in which the sales representative often pressured or confused the Beneficiary into consenting to the prescription, was either not recorded or was deliberately cut from the recording provided to the telemedicine company.

10.     The RediDoc and HPS contract, which was obtained during the investigation, provides that HPS shall pay for each Beneficiary Information Package it sent to RediDoc for a prescription. The investigation has shown that FEELEY, Belter, and HPS were really paying RediDoc for signed prescriptions, not for doctors' time or consultations. Documents obtained during the investigation revealed that in or around July 2018, FEELEY negotiated a refund with RediDoc, in which RediDoc would issue a credit to HPS when its prescription request did not result in a signed prescription. Specifically, FEELEY negotiated an $80 credit on behalf of HPS where the doctor declined to approve HPS's prescription request on the basis that the prescription was not medically necessary.

11.     The investigation has shown that FEELEY and Belter knew that the doctors at the telemedicine companies, including RediDoc, often approved the prescriptions without having had any contact with the Beneficiary and without making a bona fide assessment that the medications were medically necessary. FEELEY and Belter had access to RediDoc's portal and were able to track when the HPS prescriptions were signed by the doctors. Based upon interviews, it was not

possible for the doctors to assess or contact the Beneficiaries based on the high volume of prescriptions approved by the doctors in a very short time period, often less than 24 hours. For instance, HPS often submitted Beneficiary packages to RediDoc late at night, and then very early the next morning, the RediDoc portal showed that the prescriptions had already been signed by the doctors. Nevertheless, FEELEY and Belter continued to use the telemedicine companies to secure thousands of prescriptions for HPS's pharmacy customers.

12.     At FEELEY, Belter, and HPS's direction, the telemedicine companies steered the prescriptions signed by their doctors to pharmacies around the country. The chosen pharmacies had nothing to do with its proximity to the Beneficiary or with the Beneficiary's choice. Rather, FEELEY, Belter, and HPS directed prescriptions to specific pharmacies with whom they had kickback arrangements. Pharmacies, including Apogee, then sought to fill and dispense the pharmaceutical products, and submitted claims for reimbursement to Federal health care programs, including Medicare, and private insurance. As shown in emails and spreadsheets obtained during the investigation, once the pharmacies received reimbursement from the insurance programs, they sent a portion of the proceeds to HPS as payment for the prescriptions that HPS had paid the telemedicine companies to generate.

13.     Records obtained in the investigation showed that Belter, who was the signatory on the HPS bank account, then shared the funds with FEELEY as 50/50 partners.

14.     Through interviews with multiple witnesses, law enforcement learned that FEELEY also made the arrangements with pharmacies on behalf of HPS. Records further showed that Belter then prepared and executed the pharmacy agreements on behalf of HPS, with FEELEY's approval.

15.     As part of the scheme, HPS routinely directed RediDoc to send prescriptions to Apogee. HPS did so because HPS and Apogee had an agreement that called for Apogee to pay HPS approximately 50% of the reimbursement Apogee received from Medicare and other health care benefit programs for filling the prescriptions that HPS originated. On or about October 3, 2017, Belter signed the agreement and sent it to Apogee, copying FEELEY. Documents obtained through the investigation show that Apogee provided FEELEY, HPS, and Belter with financial breakdowns showing the amount of money Apogee received in insurance reimbursements for filling the prescriptions generated by HPS. The information provided by Apogee showed Apogee owed HPS 50% of the reimbursements it received, less any costs.

16.     In total, FEELEY and Belter caused HPS to pay approximately $978,000 in kickback and bribe payments to RediDoc bank accounts for prescriptions RediDoc facilitated through its paid doctors.

17.     In total, FEELEY, Belter and their marketing companies, including HPS, received kickbacks and bribes totaling more than approximately $6 million from Apogee in exchange for the prescription referrals from through in or about January 2016 through 2018.  Apogee transferred over $6 million to an HPS bank account controlled by Belter. Between 2016 and 2019, Belter transferred from the HPS, MMM, and MMC accounts more than $2 million to accounts held in the name of Individual-1, on behalf of FEELEY.

18.     In furtherance of the conspiracy and in order to effectuate its objects, the conspirators committed or caused the commission of the following overt acts of the conspiracy to pay and receive bribes and kickbacks, in the District of New Jersey and elsewhere:

    a.  On or about November 20, 2017, FEELEY emailed a lead generator broker, copying Belter, and requested lead information only for those Beneficiaries who had insurance. Specifically, FEELEY wrote, "[w]hat I explained the other day is we need leads that have the correct ACTIVE INSURANCE that is on the lead..." FEELEY went on to negotiate a price for the Beneficiaries' information, writing: "And we need a price point so neither one of need to deal with returns or spreadsheet upates etc just a waste of everyones time really with the back and forth and just ends up with hurt feelings in the end[.]"[3]

    b.  On or about November 7, 2018, Belter emailed a call center, copying FEELEY, regarding a conversation he and FEELEY had with the call center about working together. Belter provided HPS's compliance call script and sample recordings for the center to use when calling the Beneficiaries, and instructed the center to separately record the compliance recording with the Beneficiary leads. Specifically, Belter wrote: "[w]e need you to have two separate recordings. We only need the COMPLIANCE RECORDING- If your reps need to stop and restart recording for compliance part that is great. I do not want to have long calls and have to cut them and so on. So please we only need the compliance script recordings. (These will go onto our telemedicine)."

    c.  In or around June 2017, FEELEY arranged with RediDoc for HPS to pay RediDoc different amounts depending on whether HPS requested a prescription, durable medical equipment ("DME") order, or both. Belter then prepared and executed the agreement with RediDoc, on behalf of HPS, with FEELEY's approval.  Specifically, pursuant to the agreement, HPS would pay RediDoc as follows:  $95 for each Beneficiary referred for a prescription or lab test; $100 for each

---

[3] Communications referenced in this Complaint are described as written, including any typographical or grammatical errors.

Beneficiary referred for a DME order; and $115 for each Beneficiary referred for a combination prescription and DME order.

    d.   On or about July 3, 2018, Belter wrote an email to RediDoc, copying FEELEY, requesting a credit for HPS's prescription requests that had been declined by a doctor on the basis that the prescription was not medically necessary, pursuant to the agreement FEELEY had negotiated with Laughlin.  Specifically, Belter wrote "James spoke to Dave weeks ago. James sent you I believe a list of several consults we were charged $95.00 for medically unnecessary. Dave spoke to James said we would be getting a credit for several of those consults. I think it is a decent amount $5,000+ … Dave also mentioned to James that the cost for medically unnecessary would be $15 not the $95… We still are being charged $95 for all these consults."

    e.   FEELEY later that day replied with another example of when he believed RediDoc should refund HPS money because a so-called consultation had not resulted in a prescription. Belter then repeated that he "thought James spoke to Dave on the Medically Unnecessary patients being $95," and reiterated that the "Medically Unnecessary consults" should only be charged $15, not the $95 as stated in the written contract between RediDoc and HPS.

    f.   On or about April 13, 2017, FEELEY emailed a representative for a pharmacy hub in California, providing the "new company info" and asked that the representative "please send over new contract and REP ID code and will also need new portal access." FEELEY then provided HPS's address information and bank routing information, so the pharmacy could pay HPS for any prescriptions it generated. FEELEY worked out the compensation arrangement with the pharmacy hub, and wrote, "Need at least 50 percent but see if you can get us a bit better."

### The Health Care Fraud Conspiracy

    19.   In addition to the kickback conspiracy, FEELEY and his co-conspirators also conspired to profit illegally by defrauding health care benefit programs, including Medicare, by causing them to pay for high volumes of expensive prescriptions regardless of medical necessity and which were procured via bribes and kickbacks.

    20.   FEELEY, Belter, Luke, Laughlin, and others agreed to generate prescriptions regardless of medical necessity to be approved by doctors who were paid kickbacks by RediDoc. At FEELEY's and Belter's direction, HPS purchased lists of Beneficiaries and then cold-called them to pressure them to agree to accept prescription drugs.  HPS and the pharmacies with which it had relationships chose

particular drugs largely based on the reimbursement amounts that Medicare would pay and regardless of the medical necessity of the prescriptions.

21.     The investigation has shown that FEELEY, Belter, and HPS knew that prescriptions they obtained were fraudulent and that the Beneficiaries did not want or need the drugs that HPS convinced the Beneficiaries to agree to accept. Despite HPS's efforts to persuade Beneficiaries to receive medically unnecessary drugs, Beneficiaries would sometimes refuse the medications when the pharmacies called them to confirm their address and other information. Documents obtained in the investigation show that HPS would then re-call the Beneficiaries to once again try to convince them to agree to accept the medication, and then if successful, transfer the call back to the pharmacy to fill the prescription.

22.     For instance, on or about January 12, 2018, Belter complained to Apogee about the prescription referrals that were not filled by Apogee because the Beneficiaries had refused to accept the drug shipments. In an email obtained during the investigation, , Belter wrote to Apogee on or about January 12, 2018, explaining that he had successfully convinced patients who had originally refused the drugs when Apogee called to confirm they would accept delivery. Specifically, Belter wrote to Apogee, "I spoke to about 12 most that refused a couple Apogee could not reach[.] [O]ut of the 12 I put 10 back through to ship out." On or about January 15, 2022, Belter reiterated, "Yes it is HUGE to call 12 patients and get 10 through that DECLINED. (problem is there is 129)." In that same email, Belter explained how he convinced the Beneficiaries to accept the medications by telling them that the drugs would be provided at "no cost" to them.  Specifically, Belter wrote that he would tell the Beneficiaries when he re-called them: "Ms. Jones you were approved for your prescriptions!!!" Belter also told William Welwart that he would emphasize to the Beneficiaries that the medications and DME would be supplied to them at no cost: "People [Beneficiaries] are mostly ALL on low income . . . and cant afford a copay at all," so BELTER typically assured Beneficiaries that a third-party "assistance program" would cover the co-payment.

23.     Moreover, FEELEY, Belter, and HPS purposely did not tell the Beneficiaries which doctor would prescribe the medication. The conspirators knew that the prescriptions were not generated by genuine doctor-patient relationships because they knew the doctors were paid to generate prescriptions and often did not have any contact with Beneficiaries. As a result, the conspirators knew that the Beneficiaries might not consent to receive medication from an unknown doctor if marketers used the doctors' names on their calls.  Belter described the call process in the same email, stating that, when he called Beneficiaries, he did not provide specifics: "I think you might lose some people [Beneficiaries] when you mention a Doctor name they have never heard of."

24.     FEELEY and Belter knew the prescriptions they had bought were false and fraudulent. Among other thing, they complained to telemedicine companies when doctors did not approve HPS prescription requests based on lack of medical

necessity. FEELEY and Belter sometimes asked that the declined prescription requests be sent to a different doctor to approve. For example, a February 10, 2018 email obtained during the investigation, , showed Belter contacting RediDoc, copying FEELEY, regarding a doctor who had previously approved 20+ prescriptions with the same Beneficiary information and suddenly started declining HPS's prescription requests as "not medically necessary." Belter asked RediDoc, "[p]lease either let us know what information he is looking for so we can add it or please can we use other Doctors in those States? Can we run these patients with different Doctor or please tell us what we can do to make sure we have correct information."

25.     In a separate email obtained in the investigation, Belter emailed FEELEY regarding the declinations by the RediDoc doctor, "[w]e have several maybe 15 other DENIED due to not info or another reason which is a $95 charge for consult. Those we will get I'm sure. I sent over Dr. *** earlier he DECLINES EVERY SINGLE SCRIPT now – he used to process with same info??" FEELEY then emailed Laughlin, forwarding Belter's email and asked for a price adjustment for the declined prescriptions: "Here you go Dave scroll down and see the others that we have been over billed for or denied." Laughlin responded, "I already shared it will be corrected, promise."

26.     In those instances when HPS purportedly obtained the Beneficiaries' consent to receive the prescription drugs, it did so through deception and without regard for medical necessity. In addition to the business practices Belter described in his emails to Apogee, investigators have obtained the call scripts that HPS provided for use when calling the Beneficiaries, which included suggestive language intended to lead the Beneficiaries to agree that they had pain and needed certain drugs. In reality, HPS and its pharmacy customers had pre-selected these drugs not because the Beneficiaries wanted or needed them, but because insurance reimbursed large dollar amounts for these specific drugs.

27.     FEELEY and Belter dissolved HPS after learning of health insurance audits, law enforcement scrutiny, and criminal investigations into telemedicine fraud. FEELEY and Belter continued to work together, however, to try to bill for additional schemes, such as foot soaks and cancer genetic testing through telemedicine, under the names of two new businesses, MPC and MMC. For example, FEELEY and Belter opened a new customer relationship in or around January 2019 to supply fraudulent prescriptions and genetic testing orders through MMC. On or about January 24, 2019, the customer wrote, "I will be sending over a contract to sign. Please advise what company name to use and which one of you will be signing." Belter replied that he would be signing the contract on behalf of the new business he co-owned with FEELEY.

28.     In total, FEELEY and other co-conspirators caused the submission of false and fraudulent claims to health care benefit programs, including Medicare and

12

TRICARE, totaling in excess of $64 million for medically unnecessary prescription drugs.